STUKELY THORNTON'S EXECUTORS *v.* STUKELY THORNTON'S HEIRS.

*Wills.    Evidence.    Impeachment.    Witness.*

The proponent of a contested will is required to produce and examine all the attesting witnesses if in his power so to do.

The law of this state follows the rule of the English court of chancery, which, before a will could be established, required all the subscribing witnesses to be examined, unless impracticable, as in cases where an attesting witness is dead, insane, absent from the state, or rendered incompetent subsequent to his attestation.

The rule is founded upon reasons of policy and caution, and has no reference to the measure of proof. The will should be admitted to probate if there is a fair balance of testimony in favor of its validity.

While the will may not be established without the testimony of the subscribing witnesses when obtainable, it may be without this testimony *in its favor.* It may be probated against this testimony by proof of the necessary facts from others.

It is well settled that a party may prove the facts in issue to be different from a statement of them made by witnesses he has called.

But, as a general rule, a party is estopped from introducing testimony merely to discredit his own witnesses, even though the witness has been examined by the other party upon new matter. The sanity of the testator is not new matter as distinguished from the regularity of the signatures; but both are branches of the same matter—the due execution of the will.

This general rule is not inflexible. If the subscribing witness to a will gives testimony against his attestation to the effect that the decedent was not of testamentary capacity, the proponent, who has been compelled by the rule of law to call him, is at liberty not only to prove the fact to be otherwise, but also to impeach the credit of such witness by proving that the witness has made previous declarations inconsistent with his testimony.

The proponent of the contested will produced the three subscribing witnesses and examined two, but declined to examine the third. The court required the proponent to examine the third which he did under this order, but only as to the formalities of the execution. On cross-examination the witness said that the decedent was not of sound mind when he executed the will. The proponent was then permitted to impeach the witness by proving his previous declarations to the effect that the decedent was of testamentary capacity at the time in question; and *it is held* there was no error.

The testimony of a subscribing witness as to the sanity of the testator is required in part on account of his special opportunity and occasion to observe the capacity of the decedent at the precise moment in question, but is to be weighed not only with reference to this but also with reference to his care, skill, judgment,

Thornton's Executors *v.* Thornton's Heirs.

memory, and truth. His testimony is not invested by law with any fictitious official value beyond what it is worth under the usual considerations which govern the value of testimony.

It was not error for the court to refuse to tell the jury that certain testimony against the sanity of the decedent created a strong presumption against the validity of the will, even though it came from an attesting witness who was also the attending physician of the alleged testator.

A draft of a will which was never executed by the testator but was made under his direction, may, where accompanied by proper evidence, afford "very considerable light" upon the question of the testator's intentions, and is evidence upon the questions of capacity and undue influence.

The party discharged but did not conceal a witness who was subsequently called and examined by the other party. It was not error for the court not to permit the party to be asked whether he discharged the witness on account of an apprehension that he would testify to certain facts.

When a witness, after being once examined and dismissed, returns to correct an error in his testimony, the court may in their discretion limit the cross-examination strictly to the point corrected.

That a legacy is made which would not have been thought of but for the suggestion of another, does not necessarily prove incapacity. That suggestions were made does not necessarily prove that the legacy would have been forgotten without them, but it is circumstance proper to be considered with others upon the main question of capacity. The contestant is not, on special request, entitled to a charge that the jury may infer that the legacies suggested would have been forgotten but for the suggestion, and that from this they may infer incapacity. It is enough if the court give the jury the true rule as to what constitutes testamentary capacity, and directs the attention of the jury to the classes of evidence on each side which relate to it.

Where the testimony is conflicting, a party cannot, on special request, insist that the court shall collate certain conceded and certain disputed facts—relating to the testator's age, infirmity, malady, the fairness of the will, the importunities of legatees and the persons about him—and isolating these facts from others which affect their force, make them the subject of a distinct branch of his charge to the jury, as sufficient, if found, to authorize the jury to infer undue influence. It is enough if the court gives the jury the true rule as to what constitutes such undue influence as to invalidate a will, and, after calling their attention to the matters named in the request and to the other evidence on each side bearing upon this point, leaves the jury to pass upon the question in view of all these facts together.

THIS case was an appeal from a decree of the probate court for the district of Fairhaven, approving and allowing a certain instrument in writing as and for the last will and testament of Stukely Thornton, late of Castleton, in said district, deceased. The instrument in

writing was propounded or presented for probate by Robert E. Maranville, the executor therein named, who is hereinafter referred to as the proponent, and the appeal was taken by Jeremiah Thornton, Abel J. W. Thornton, Mariette Beach, and Lucy Downs, as heirs at law of said Stukely Thornton, deceased, and the appellants are hereinafter referred to as the contestants. Plea by the contestants, that the instrument in writing is not the last will and testament of Stukely Thornton, deceased, concluding to the country. Upon this plea issue was duly joined, and there was a trial by jury at the March Term, 1865, Rutland county, KELLOGG, J., presiding.

No question was made on the trial in respect to the formal execution of the instrument by Stukely Thornton, agreeably to the requisitions of the statute, and there was no question made but that it was executed on the day it bears date, and on the occasion of the last sickness of the deceased, and on the day preceding his death. The instrument bears date on the 15th of March, A. D. 1862. It appeared that the deceased died on Sunday the 16th of March, A. D. 1862, at about the hour of six o'clock in the afternoon, and that, at the time of his death, he lacked a few days of being 84 years of age.

The contestants objected to the instrument as being the last will and testament of Stukely Thornton, deceased, mainly upon the grounds (1.) that he was not of sound and disposing mind and memory when the same was executed, and (2.) that the instrument was procured to be executed by the undue influence upon him of those mainly benefitted by its provisions. Other subordinate questions arose or were made during the progress of the trial which will be stated hereafter in their proper connection.

It appeared that Stukely Thornton had three sons, who each died in his life-time leaving children ; that the oldest of these sons was Stukely Thornton, Junior, who died about the year 1840, leaving two daughters, viz : Mary, who afterwards married one Maynard, and subsequently died leaving a son, Stukely T,, and a daughter, Lucy, who afterwards married one Downs, and that at the time of the death of Stukely Thornton, the alleged testator, the said Stukely T. Maynard and Lucy Downs were the only legal representatives then

living of his said deceased son Stukely Thornton Junior; that his second son, Jeremiah Thornton, died about the year 1857, and that at the time of the decease of the alleged testator, Jeremiah Thornton, Abel J. W. Thornton, and Mrs. Mariette Beach, who were children of Jeremiah Thornton, deceased, were the only legal representatives then living of the said Jeremiah Thornton; that the alleged testator's third or youngest son, Abel Thornton, died on the 7th day of March, A. D. 1862, leaving two children, viz: Asahel P. Thornton, and Flora C., the wife of said Robert E. Maranville, and that said Asahel P. Thornton and Flora C. Maranville were, at the time of the decease of the alleged testator, the only legal representatives of his deceased son Abel Thornton.

The alleged testator died leaving a widow, Mary Thornton, who was the mother of his said three sons, and his son Abel Thornton died leaving a widow, Eveline Thornton. At the time of the decease of the alleged testator, Robert E. Maranville and Flora C. his wife, had two children, viz: Flora Jane, who was born in 1858, and Mary Eveline, who was born in 1861. Abel Thornton, from the time of his marriage to the said Eveline, his wife, which was in the year 1829, to the time of his death, always resided in the same dwelling house, and lived in the same family, with his father, (as he had done previously to his said marriage,) and Robert E. Maranville and Flora C., his wife, at the time of the decease of Abel Thornton and his father as aforesaid, were also living in the same dwelling house occupied by Abel Thornton and his father, and had resided there for some considerable time previous thereto. After the decease of Stukely Thornton, Junior, his two daughters, Mary and Lucy, went to reside in the family of their grandfather, the alleged testator, and continued to reside there until their respective marriages, or for some six or seven years or more, and, with the exception of their clothing, they were provided for by their grandfather, and performed some services in his family during that time.

It further appeared that for many years prior to and until the decease of the alleged testator's son Jeremiah, the alleged testator and his two sons Jeremiah and Abel were more or less connected in carrying on the various branches of the business of farming as co-

partners, and that at the decease of Jeremiah, the three owned a large amount of property in common, which was thereupon divided, so far as the estate of Jeremiah was concerned, and that, thereafterwards, the alleged testator and his son Abel continued to carry on business to some extent as co-partners, and that, at the decease of Abel, property to a large amount was held by them in common, but to what amount did not appear, nor did it appear that it was so situated as to be difficult of separation or division.

The evidence on the part of the contestants tended to show that the alleged testator left an estate worth from twenty to twenty-five thousand dollars, while the evidence on the part of the proponent tended to show that it was worth only from eight to nine thousand dollars.

None but friendly relations were attempted to be shown to have existed between the alleged testator and his various grandchildren with the exception of an alleged difficulty between Jeremiah Thornton, one of said grandchildren, who was the administrator of the estate of his father, Jeremiah Thornton, the second son of the alleged testator, and Abel Thornton, the youngest son of the alleged testator, growing out of the settlement of the accounts between the estate of Jeremiah Thornton, deceased, and Abel Thornton, in respect to which, the evidence tended to show that there was from three to six hundred dollars in dispute, and that the alleged testator was displeased with the course taken in respect thereto by his grandson Jeremiah. The evidence on the part of the contestants tended to show that no difficulty in fact ever existed between the said Jeremiah (son of Jeremiah, deceased,) and Abel Thornton, and that the alleged testator never had any cause for displeasure, and, in fact never found any fault with his grandson Jeremiah in respect to the said settlement. It further appeared that all of the heirs at law of the alleged testator had always resided near him, and were in frequent and friendly intercourse with him.

The proponent introduced and read the deposition of Stukely T. Parker, one of the attesting and subscribing witnesses to the said instrument.

The proponent then called Cyrenius M. Willard, another of the

attesting and subscribing witnesses to the said instrument, and he testified as a witness on the trial.

The proponent then introduced and read the deposition of Hiram D. Colvin, who testified under objection to the mental peculiarities of the alleged testator as observed from a lifelong acquaintance with him, and also to the drawing of two wills for him, one in 1858 and one in 1860 ; that he, the witness, was then residing in Rochester, New York, and while visiting the alleged testator in 1858, the latter requested the witness to write a will for him ; that he took notes as dictated by the alleged testator, and after he went home wrote out a will and sent it to him ; that while visiting the latter again in 1860, the alleged testator told him of some changes he wanted made in his will, and the reasons for them, and that he again took notes, and after he returned home, wrote out another will and sent it to the alleged testator, as requested by the latter.   The last question asked the witness on the direct examination, was as follows :   "At the time he gave you the notes in each case, for drawing the two wills, and the last time you saw him, was he in your opinion of sound disposing mind ?"   *Answer,* " He was."   Neither of said wills was ever executed.   The contestants objected to the reception of this deposition as evidence on the ground that it was not relevant to the issue on trial, but waived the objection so far as it applied to the last question and answer on the direct examination.   The court overruled the objection, and allowed the deposition to be introduced and read as evidence.   To this decision the contestants excepted.

The proponent, after introducing the testimony of other witnesses in support of the issue on his part, stated that he rested his case ; but Jonathan D. Woodward, the remaining attesting and subscribing witness to the said instrument, not having been called as a witness, and the contestants insisting that the proponent should be required to produce and call upon Woodward as a witness before resting the case on his part, and it appearing that Woodward was within the reach of the process of the court, and was in fact present at the trial, the court decided that it was the duty of the proponent to produce and call him as a witness before resting his case.   To this decision the proponent excepted, and then, in accordance with the said decis-

ion, he produced and called Woodward as a witness, and he thereupon testified as a witness on the trial.

The said Woodward on his cross-examination by the counsel for the contestants, in substance testified that he attended the alleged testator in his last sickness, and that in his opinion, the alleged testator, at the time of the execution of said instrument, was not able or capable to execute a will, and was not able to comprehend or understand such a disposition of his property as is made by the instrument. He said : "I can but come to the conclusion, from all I could discover—I said nothing to the man, and didn't hear him speak, more than to answer one or two questions, at the time the will was executed—that the man was not able, not capable, he was too far gone, too near death, to execute a will, and it is the opinion which I formed that he was not able to comprehend or understand such a disposition of his property as is made by this instrument ; and I formed this opinion merely from his appearance at that time, for I hadn't then even examined him on that day ; his subsequent falling into a state of insensibility in so short a time afterwards, confirms this opinion in my mind. I expected that he would go off in that way, and saw that it was approaching." And the contestants claimed and insisted that, upon this testimony, the said instrument should be regarded as not legally executed, for the reason that the statute contemplates and requires that each of the three subscribing witnesses to a will shall certify to the mental capacity of the testator, or his competency to make a will, as well as to the fact of his signature to it ; but the court declined so to rule, and to the decision by which the court declined so to rule the contestants excepted. On the re-examination of Woodward by the proponent, the following question was put to him, viz : "Did you not say to Mrs. Parker, or in her presence, on that Saturday afternoon when you came back to Mr. Thornton's house, that there was a sudden change, and that it seemed as though the old gentleman was just spared to do his business, and that that was all?" with the avowed purpose of laying the ground for impeaching the credit of the witness in respect to his testimony as to the competency of the alleged testator to execute the said instrument and to comprehend and understand its provisions.

This question was objected to by the contestants, and was allowed by the court, and to this decision the contestants excepted. And also, on the re-examination of Woodward by the proponent, the following question was put to him, with the same avowed purpose as above stated, viz: "Did you not say in the presence of old Mrs. Thornton, and Mrs. Eveline Thornton, on Saturday, after the execution of the will by Mr. Thornton, in answer to an inquiry if he knew what he was about, in words to this effect, 'yes, as well as you or I know?'" This question was objected to by the contestants, and was allowed by the court, and to this decision the contestants excepted. The witness said, among other things on the re-examination, "I am not sure that I had any conversation with him on that day. I adopted no tests on that day to ascertain what the condition of his mind was. I did nothing to call out his mind, more than to get an answer to my questions. I did not, that I know of, make any suggestion at the time of the execution of this will, to Mr. Willard or to any other person present that I doubted the capacity of the old gentleman to make a will—not that I know of."

Dr. Charles L. Allen was called as a witness by the contestants, and testified that he had been in the practice of medicine for about twenty years, and had been a professor in the medical schools at Castleton and Burlington, and had for about one year and a half been one of the United States examining board of surgeons at Washington. After he had given testimony in respect to the characteristics of typhus and typhoid fever, and of the effect of these diseases upon a patient laboring under the same, he answered a hypothetical question put by the counsel for the contestants.

On his cross-examination, the following question was put to the same witness by the proponent:

*Question.* "Supposing a man to be 84 years of age, somewhat ill, but so as to be able to be about the house and out of doors all through Thursday, and to do his chores out of doors on Friday morning, and to go out of doors during that day, and, on that day, talks with a friend sensibly and intelligently in regard to the making of a will, and provides for some one to be sent for to draw his will, and should give intelligent reasons for not signing a will already made, and why

he wanted another drawn,—what, in your opinion, would be the mental capacity of that person, although to some extent laboring under a typhoid condition?"

This question was objected to by the contestants, but, as the proponent claimed that the evidence would establish or prove that the conditions involved in the question existed in the case on trial, it was allowed by the court to be put, and the witness answered the same as follows, viz:

*Answer.* " Of course, if he holds intelligent conversation in regard to the will, I must understand that he has the necessary intelligence to enable him to make a will. In other words, the typhoid condition in such a case could not exist to any very great extent at that time." To the decision of the court by which the said last mentioned question was allowed to be put to the witness the contestants excepted.

The proponent offered in evidence the deposition of Mrs. Charlotte Parker, and, when introducing his rebutting testimony, was allowed to read from the same the following question and answer, which, being objected to by the contestants, were not read when the deposition was introduced and read in the opening of the proponent's case, viz:

*Question.* " What did Dr. Woodward then say to you in reference to Mr. Thornton? Objected to as being hearsay. *Answer.* He said that there was a sudden change. He said that it seemed as though he was just spared to do his business, and that was all."

The said deposition was introduced, and with the exception of this question and answer, was read in the opening of the proponent's case, and before Dr. Woodward was called and testified as a witness. When the proponent was introducing his rebutting testimony, he proposed to read, and was allowed to read, this question and answer from the said deposition. The contestants objected to the reading of the said question and answer, on the grounds (1.) that it was not admissible for the proponent to impeach one of the attesting witnesses to the said instrument who had been called by himself, and (2.) that the answer had no tendency to impeach the testimony of the said Woodward. The objection of the contestants to the reading of the said question and answer was overruled, and the same were

allowed to be read, and were read, from the deposition as evidence ; and to this decision of the court the contestants excepted.

When the proponent was introducing his rebutting testimony, the said Robert E. Maranville, the proponent, was called as a witness in his own behalf, and, among other things, testified as follows, viz : " I had a talk with Dr. Woodward, at his house, just before the hearing in the probate court in respect to the probate of this will. I was there after some medicine for a sick child. I remarked to him that I had heard that Jerry Thornton and the other heirs were going to try to break grandfather's" ( referring to the alleged testator,) "will. He asked me upon what grounds they were going to make that effort. I told him because they thought him incompetent, —on the ground of incompetency,—and was not capable of making a will. He said that grandfather was perfectly capable of making a will; that they could not break the will; that grandfather knew what he was about when he made the will." To this testimony the contestants also objected. Woodward had previously, on his re-examination by the proponent's counsel, testified as follows, viz :— " I remember of Mr. Maranville being at my house one time, and think that he got some medicine. I don't know but that it was between the old gentleman's death, and the time of the hearing in the probate court in reference to this will. I don't remember of any conversation with him in reference to the old gentleman, or his will, or his capacity to make a will, at that or any other time." The court overruled the objection of the contestants to the last mentioned testimony of the proponent, and received the said testimony. To the decision of the court the contestants excepted. The same witness testified on his direct examination that Mr. Solomon Farwell ( who had previously been called and examined as a witness by the proponent when introducing his rebutting testimony) was at the house of the alleged testator on the Friday next preceding the alleged testator's death, and, on his cross-examination, he further testified that he thought that Mrs. Wood, the wife of Jonathan Wood, was there on the same day that Farwell was there, and that he had caused the said Jonathan Wood to be summoned to attend court as a witness in this case, but had discharged him from further attendance. The counsel

for the contestants then put this question to the witness, (the propo-
nent,) viz :—"*Question :* Did you not discharge Mr. Wood from
further attendance as a witness because you apprehended that he
would testify that his wife was at Mr. Thornton's on Thursday?"
The contestants claimed, and subsequently gave evidence tending to
prove that it was on the Thursday, and not on the Friday, next pre-
ceding the death of the alleged testator when Mrs. Wood was at his
house ; and the true day when Farwell was there,—whether it was
Thursday or Friday,—was material and was in controversy on the
trial. The last mentioned question was objected to by the counsel
for the proponent, and excluded by the court ; and to the decision of
the court the contestants excepted.

On the first day of the trial, the said Cyrenius M. Willard, one of
the attesting and subscribing witnesses to the said instrument, when
produced and called as a witness by the proponent as aforesaid, tes-
tified on his direct examination, among other things, that the alleged
testator, when giving him directions in respect to preparing the draft
of the said instrument, made the inquiry of some one present how
the title to the farm on which he then lived,—the Denison farm,
—stood. Willard was fully cross-examined on the part of the con-
testants, but no question was put to him on his cross-examination in
respect to this portion of his testimony.

On the ninth day of the trial, while the proponent was introducing
his rebutting testimony, the proponent's counsel stated to the court
that the said Willard desired to make a correction in the testimony
which he had given on the trial, and therefore recalled him as a
witness. Willard, thereupon, but not in answer to any question on
the part of the proponent, testified ( without objection being made,)
as follows, viz :—" I am now satisfied that I was in error in my tes-
timony here on the point of the old gentleman's" (referring to the
alleged testator,) "asking in whose name the title to the Denison
farm stood. I am satisfied now that I made the inquiry myself."
Being thereupon cross-examined by the counsel for the contestants,
Willard testified as follows, viz :—" I received a telegram last even-
ing to come over here, and when I came here, my attention was
called to my testimony, and I was satisfied. I felt very strongly that

I was not mistaken about this when I testified." The counsel for contestants then put the following question to Willard, viz :—"*Question* :—Are you not as likely to be mistaken on other points in which your testimony differs from that which you gave before the probate court as you are in this?" The court refused to allow this question to be put although it was not objected to by the counsel for the proponent, and decided that at that stage of the trial, the cross-examination of the witness should be limited and confined exclusively to the point in respect to which he corrected his testimony as aforesaid, and that the case was not then open for the cross-examination of the witness in respect to any other point or points in his previous testimony. To this refusal and decision of the court the contestants excepted. When Willard corrected his testimony as aforesaid, no testimony had been introduced by either party in respect to his previous testimony on that point except such as is above detailed.

The contestants' testimony tended to show that, for several years next before the death of the alleged testator, he had given up business except the doing of light chores about the house and barns; that he seldom went away from home ; that his mental faculties had become greatly impaired by reason of old age and physical decay ; that, in the year 1853, he had an ill turn, resembling or producing stupor and insensibility ; that in the last year or two years of his life, he became very forgetful, and did not recognize or know his most familiar friends, and even relatives, when they called on him ; that his son Abel, with whom he resided, was taken sick with the disease called measles, and after a sickness of a few days, died of that disease on Friday, the 7th of March, 1862, which was nine days before his own death, and that the effect of the loss of his son Abel, upon his mental faculties and bodily health, was very marked, and that he appeared to be greatly prostrated or broken down and overcome by this affliction ; that on the next following Monday, which was the day of the funeral of his son Abel, he was in a chamber room most of the day, and was not in the room where the funeral services were conducted, and appeared to be quite sick, and " a little lost, or wild," and "as though he was out of his head," ( as it was expressed by Wm. Broughton, one of the witnesses for the con-

testants,) and that, during the whole day he was stupid and inclined to sleep, and would not converse except when aroused, and then only to answer in brief sentences such inquiries as were made of him; that, on that day, he did not recognize neighbors and relatives who went into the chamber to see him, and that, when awake, he wept almost continually, and did not seem to realize that a funeral was taking place, or to know what was passing around him; that from this time forward to the time of his death, which was on the next following Sunday, he continued to run down and fail in both body and mind, and was worse or more ill on Tuesday, and still worse on Wednesday; that, on Thursday, the said Jonathan D. Woodward, who was a physician, was called to visit him; that, on Friday, the said alleged testator grew worse and steadily failed until he became totally unconscious, which was on Saturday in the afternoon, from an hour and a half to two hours and a half after the said instrument in writing was executed, and that, from the time of becoming totally unconscious, he continued in that condition until the time of his death, which was on Sunday, the next following day, about the hour of six o'clock in the afternoon, as above mentioned; that his leading symptom during his sickness was that of stupor, such as usually attends upon typhoid diseases, and that during his whole sickness he was incapable of connected and intelligent conversation, and not able to comprehend and understand such a disposition of his property as is contained in the said instrument in writing.

The contestants' testimony also tended to show that there was undue influence exerted over the alleged testator to procure the making and executing of the said instrument, and that the same was not his free and voluntary act.

The proponent's testimony tended to contradict and disprove the defence set up and relied on by the contestants, and to show that at the time of the execution of the said instrument in writing, and at all times before that time in respect to which the mental capacity of the said alleged testator was questioned, he possessed sufficient mental capacity to understand the state of his property and his family and kindred, and the nature and effect of a will, and that when the said instrument in writing was executed, he fully comprehended

and understood the nature of the transaction and the effect of the said instrument, and that the disposition of his property contained in the said instrument, was not procured by any undue influence whatever, and was in substantial accordance with his previously expressed intentions in respect to a testamentary disposition of his property.

It appeared, from the testimony on both sides, that the alleged testator, in the last years of his life, was somewhat deaf, and that his eyesight had become partially impaired.

The said instrument in writing was introduced and read by the proponent as evidence in the opening of his case.

To his wife, Mary Thornton, the alleged testator gave a farm in Ira, and a piece of land in Poultney.

To the heirs at law of his deceased son, Jeremiah Thornton, to be equally divided between them, a farm in Poultney and a lot in Ira.

To Lucy Dowers, daughter of his deceased son Stukely Thornton, $300.

To his great-grand-son Stukely T. Maynard, $100.

To his great-grand-children Flora I., and Mary Eveline, Maranville, $100. each.

And all the remainder of his estate, real and personal, to Eveline Thornton, widow of his deceased son, Abel Thornton.

The contestants claimed, (1st.) that the alleged testator had by the decay incident to his extreme age and infirmity, upon which was superinduced the mental shock and affliction occasioned by the loss of his son, and the immediate effects of typhoid disease and approaching death, so far lost his faculties of mind and independence of will at the time of the execution of the instrument in question, as to be incapable of making a valid disposition of his estate ; (2d.) that even if his mental capacity was not so far impaired as to preclude him in any event from making a valid will, it was greatly weakened and enfeebled, and that, while in this condition, the said instrument in question was obtained from him by the undue influence of those mainly benefitted by it; and (3d.) that the case was to be regarded as one of imbecility, childishness, or *senile dementia*, and not as one of original incapacity or insanity; though some few of its symptoms were similar to those found in insanity.

The contestants made twelve requests to the court to charge the jury. The charge upon the *first, second, fifth, seventh, eighth, tenth* and *twelfth* requests, being satisfactory to the contestants, exceptions were reserved to the charge upon the *third, fourth, sixth, ninth* and *eleventh* requests only, therefore the first named requests are omitted in this statement.

The last named requests are as follows :

*Third request :*—That if the jury should find that, when the instrument in question was executed, the alleged testator would not have remembered, without prompting, young Stukely Maynard and the children of the said Maranville, the proponent, who had claims upon him, and to whom bequests were actually made in the said instrument, they would be authorized to infer from this a want of testamentary capacity on his part? The court refused so to instruct the jury.

*Fourth :*—That if the jury should find that no provisions would have been made by the alleged testator for his wife, on the occasion of the execution of the instrument in question, but for the suggestions and promptings of others, although he had no motive or intention to the contrary, they would be authorized to infer from that fact a want of sufficient testamentary capacity on his part to make a valid will. The court refused so to instruct the jury.

*Sixth :*—That the testimony of Doctor Jonathan D. Woodward, as being one of the subscribing witnesses of the instrument in question, and the attending physician of the alleged testator, was entitled to much consideration on the question of capacity, and raised a strong presumption against the validity of the will. The court refused so to instruct the jury.

*Ninth :*—That if the jury should find that the alleged testator was of extreme old age and weak mind,—that he was suffering under a malady or disease whose leading symptom and effect was prostration, lethargy, and stupefaction of the mind,—that he was near unto death, and was surrounded, before and at the time of the execution of the instrument in question, by persons principally benefitted by its provisions,—that his relatives for whom no provision, or no proper or just provision, was made, were absent, and that the provis-

ions in respect to those having claims upon the testator were une-qual, unnatural, or unjust, these facts, taken together, would afford evidence from which the jury would be at liberty to infer and find undue influence exercised upon and over the mind of the testator, to such an extent as to render the instrument inoperative and void. The court refused so to instruct the jury.

*Eleventh :*—That the evidence in regard to the two previous wills drawn up but not executed by the alleged testator, afforded no proof of any previous intention on his part that could be taken into consid-eration on the question of capacity or of influence, (1st.) because two wills are shown to have been made, one of which was not pro-duced, though enough appeared from the deposition of Hiram D. Colvin to show that it differed widely from the instrument in ques-tion in favor of the contestants, and that one will, therefore, would afford no more evidence of intention one way than the other would the other way ; and (2d.) because the will produced was never exe-cuted by the alleged testator, but was retained by him to a very advanced period of life without being executed ; showing, therefore, not an intention to execute it, but an intention not to execute it ; and (3d.) because the evidence showed that the only ground on which the alleged testator ever contemplated executing the former will produced instead of the former will not produced was an appre-hension on his part that his son Jeremiah's heirs might not do right in certain business transactions ; and that such apprehension never was realized, and the contemplated will was never executed, and that the instrument now in question makes less provision for all other members of the family of the alleged testator (except Mrs. Eveline Thornton,) than for the heirs of his son Jeremiah. The court refused so to instruct the jury.

In respect to the *sixth* request, the court instructed the jury that in determining the just weight and value of the testimony of Doctor Woodward in respect to the mental condition or capacity of the alleged testator, they should take into consideration his professional skill and experience, but that the weight and value of his testimony, as well as the weight and value of the testimony of any other wit-nesses on the same point should also be considered and determined

9

with reference to his opportunity for observation, his skill and care in observing, and his intelligence and powers of discernment and memory.

In regard to the degree of capacity which the jury must be satisfied that the alleged testator possessed at the time of the making of the instrument in question, referred to in the *second* request, the court further instructed the jury that it would not be sufficient that the alleged testator might be able to comprehend and understand a question which might be propounded to him, and answer it in a rational manner, nor was it necessary that he should have such a capacity of mind as would justify his engaging in complex and intricate business,—a lower degree of intellect being requisite to make a will than to make a contract; but that the jury must be satisfied, in order to justify them in establishing the instrument in question as the will of the alleged testator, that when he executed it, he was capable of knowing and understanding the nature of the business he was then engaged in, and the elements of which the said instrument was composed, and the dispositions of his property as therein provided for, both as to the property he meant to dispose of by his will, and the person or persons whom he meant to be benefitted by it, and the manner in which that property was to be distributed between them; and that, if the jury found all this, then it should be found that the alleged testator had sufficient capacity to make and execute the instrument in question as a will; but otherwise not.

In respect to the question of undue influence referred to in the *seventh, eighth, ninth* and *tenth* requests, the court also instructed the jury that it was not enough to avoid or defeat a will on this ground that it was made under the influence of gratitude, affection or esteem, or of acts of attention and kindness, but the influence or importunity which is to be regarded as undue must be such as could not be resisted, or such as to deprive the person making the will of the free exercise of his will, and such as to amount to the control of another will over that of the alleged testator, whose faculties have been so impaired as to submit to that control, so that he has ceased to be a free agent, and has yielded or succumbed to the

power of that controlling will; and that the proper inquiry upon this part of the case would be,—had the alleged testator free volition in making the instrument in question, and was it really in accordance with his intentions. And on the subject of the *ninth* request above mentioned,—in respect to this point of alleged undue influence,—the court further instructed the jury that they should take into consideration the age, mental condition and malady or disease of the alleged testator, including the symptoms of that disease and its effect upon him, and all the circumstances attending the entire transaction and under which the alleged will was executed, as well as the reasonableness and fairness of the provisions of the alleged will as a disposition of his estate by will towards the natural objects of his bounty,—his wife and the representatives of his children, or those who would succeed to his estate if he left no will,—in determining whether his act in making this alleged will was free and voluntary, or was in fact the offspring of undue influence; but that if the jury should find that the alleged testator, at the time of making and executing the instrument in question, understood the state of his property and of his family, and was in a condition fully to comprehend the nature of the transaction and the effect of the said instrument, and he had free volition, and the said instrument was really in accordance with his intentions, and was executed agreeably to the requirements of the statute, then the instrument should be considered as a valid will.

In respect to the *eleventh* request the court instructed the jury that the unexecuted will of the alleged testator, annexed to the said deposition of Hiram D. Colvin, was of no other importance than as a means of ascertaining, in connection with the facts stated in that deposition, the instructions given by the alleged testator to the said Hiram D. Colvin in respect to the preparation of the draft for that will and also in respect to the preparation of the draft for the previous unexecuted will which is referred to in the same deposition; that if it was doubtful whether the instrument in question was really in accordance with the intentions of the alleged testator when it was executed, his previously declared purposes in respect to a disposition of his property, if made at a time when his mental capacity was

unquestioned, might properly be taken into consideration by the jury in determining that point; that the whole testimony in the case, on the subject, in respect to the declarations made by the alleged testator concerning the said unexecuted wills, or either of them, was also to be considered in the same connection; and that if the jury should find that the alleged testator, when he gave those instructions and made those declarations had sufficient mental capacity to comprehend and understand the nature and effect of a will, and the disposition of his property by a will, then the directions which he gave to the said Hiram D. Colvin in respect to the making of the draft of a will, which the deposition of the said Hiram D. Colvin tended to prove, should be treated as furnishing very considerable light in regard to the alleged testator's matured and settled purposes in respect to a testamentary disposition of his property, at the time when those instructions were given, and were proper to be taken into consideration as tending to show what those purposes were. It did not appear what had become of the first unexecuted will referred to in the deposition of Hiram D. Colvin, and there was no testimony bearing on that point except the said deposition and the testimony of the proponent that he knew nothing about it. In connection with the instructions on this point, the court also called the attention of the jury to the testimony on the part of the contestants in respect to the previously declared purposes of the alleged testator as to a testamentary disposition of his property, as well as to the testimony on the part of the proponent in respect to the same point.

The contestants excepted to the refusal of the court to rule and charge the jury according to the points and requests by them made, so far as the court did so refuse, and to the instructions given to the jury as above mentioned in all points or particulars in which they differed from, or were not in accordance with the contestants' said requests as above stated.

In respect to the statute requisitions for the formal execution of a valid will and to all other questions or points made or arising in the case, the court gave to the jury such instructions as were satisfactory to the contestants, or as were not made the subject of exception on their part.

Thornton's Executors. *v.* Thornton's Heirs.

The jury returned a verdict that the said instrument in writing was the last will and testament of the said Stukely Thornton, deceased; and the court thereupon rendered judgment, and allowed the proponent to recover against the contestants his taxable costs arising from the said appeal.

*Edwin Edgerton, C. C. Dewey* and *E. J. Phelps,* for the contestants.

I.   The rulings and charge relative to Colvin's deposition were erroneous.   If the deposition was admissible at all, the request of the contestants concerning it should have been complied with in the charge.   And the jury should have been instructed, that no proof was to be derived from the previous wills, that would tend to sustain the present will.

1.   Two previous wills are stated by the witness to have been made.   The first was not produced, though enough appeared of its contents to show that it differed widely, in favor of the contestants, from the present will.   One of these wills, therefore, afforded no more evidence of intention one way, than the other did the other way.

2.   The second previous will produced and relied on, was never executed by the testator, but was retained by him to a very advanced period of life, without being executed.   Showing, not an intention to execute it, but an intention not to execute it.

3.   The proof showed that the only ground on which the testator ever contemplated executing the former will produced, instead of the former will not produced, was an apprehension that his son Jeremiah's heirs might not do right in a certain settlement with him; and that such apprehension never was realized, and the will never executed.   While the will now in question makes a less provision for all other members of the testator's family, ( except Eveline Thornton,) than for the heirs of his son Jeremiah.

These facts, therefore, afforded not the slightest evidence of any previous intention in the testator conformable to the present will, but rather the contrary.

II.   Evidence was improperly admitted on the part of the proponent, to impeach Dr. Woodward, one of the subscribing witnesses to the will.

No rule is better settled than that which precludes a party from impeaching his own witness. The foundation of the rule is, that a party shall not be allowed to discredit a witness he has himself brought forward and proposed as one worthy of credit. It is now claimed, that as he is obliged to call the witness, the reason of the rule does not apply, and he must therefore be allowed to impeach him. But the proponent represents and claims under the testator. And is only obliged to call the subscribing witness, because the testator selected and made him the witness to the will, to be necessarily examined in court on its probate.

He is therefore in the fullest sense the witness of the party, carefully chosen and made so beforehand, when the choice of witnesses was unlimited. And not as in ordinary cases, confined within the circle of those happening to be cognizant of a particular transaction. The attestation of the witness is an indispensable part of the execution of the will, as his evidence is of its proof. Redf. on Wills, 255, note. Having been provided to attest it, he must be called. But he is not the less the witness of the party calling him, because he was deliberately selected to become so. The ordinary rule, therefore, applies to such a case with much additional force.

GREENLEAF intimates, with considerable hesitation and doubt, that a party may, perhaps, impeach his subscribing witness. 1. Greenl. Ev., § 443. But not one of the cases he cites will be found to sustain the proposition. They, none of them, go farther than to hold that the party may contradict his witness by other evidence. Such is the rule as given by Starkie. 1 Starkie's Ev., 216. And the following authorities will be found in point against the allowance of such an impeachment. *Ewer* v. *Ambrose*, 3 B. & C. 746; ( 10 E. C. L. 220) ; *In Re Lochlibo*, 1 E. L. & Eq. 645 ; *Jackson* v. *Varrick*, 7 Cow. 238 ; *Brown* v. *Bellows*, 4 Pick. 194 ; *Whitaker* v. *Salisbury*, 15 Pick. 544 ; Opinion of SHEPLEY, J., in *Dennett* v. *Dow*, 17 Maine, 24.

Could a subscribing witness to an ordinary deed or contract, whom the party, having made him so, is compelled by the rules of law to call to prove the signature, be impeached by that party, because having chosen to make him the witness, he was thereby obliged to call him.

Some reflections that have been made on the duty of a subscribing witness not to attest unless he is satisfied as to capacity, have no application.  The statute requires no such thing.  And, practically, it is well understood that subscribing witnesses do not understand any other obligation to be implied, than to tell the truth when called. Redf. on Wills, 96.

III.  The question put by the proponent to Dr. Allen was absurdly inadmissible.  The question is purely one for the jury, and on which the opinion of any witness is inadmissible.  1 Greenl. Ev., § 440, and cases cited; *Lester* v. *Pittsford*, 7 Vt. 161; *Fairchild* v. *Bascomb*, 35 Vt. 398.

IV.  The court erred in excluding the question put to the proponent on cross-examination, relative to his reason for discharging Jonathan Wood from further attendance as a witness.

V.  The question put to Willard on cross-examination was improperly excluded.

VI.  The refusal of the court to charge in accordance with the third and fourth requests of the contestants, was erroneous.  The statement to the jury of the general rule of law, did not obviate the necessity of a suitable application of it to the evidence.  The application requested was emphatically called for by the evidence.  To refuse it was in effect to do away with the general rule laid down by the court.  It is not easy to see how a man can be regarded as capable of "*collecting and retaining in his mind without prompting, the names and number of those having claims upon him,*" and of "*remembering all and forgetting none,*" when in making his will he forgets his wife and favorite grandchildren, and would not have remembered to make provisions for either, but for the promptings of others.  Upon the point of this request, it will be noticed, the court gave no instructions at all.

VII.  The refusal of contestants' sixth request, relative to the testimony of Dr. Woodward, and the charge on that subject were wrong.  1 Jarman on Wills, 76, and cases cited.

It is perfectly settled in cases of this description, that the testimony of subscribing witnesses as to capacity, is of the greatest consequence, and more important than that of any others.  The law

places them about the testator for the express purpose of becoming witnesses on this point. Without them the will cannot be executed. They are something more than mere bystanders. *Cornelius* v. *Cornelius*, 7 Jones, N. C. 593 ; ( 21 U. S. Dig. 552, § 10.) Hence it is that they are to be required by the law to be called on the trial. And in many cases are allowed to express an opinion touching the testator's capacity, where other professional witnesses are not. 1 Greenl. Ev. § 440, and cases cited.

In the present case, also, the witness was the attending physician of the testator, and better qualified than any other witness to judge of his physical and mental condition. But the charge of the court placed his evidence precisely on a par with that of any and all others and avoided entirely the point of the request.

VIII. The refusal of contestants' ninth request, and the charge on the point involved, were erroneous.

The evidence to prove undue influence must always be circumstantial. The presumption of undue influence raised upon the circumstances, brought together in this request, if not conclusive, is nearly so, and well authorizes that inference by the jury. *Vreland* v. *McClellan*, 1 Bradf. 393 ; *Wier* v. *Fitzgerald*, 2 *ib.* 42 ; *Wilson* v. *Moran*, 3 *ib.* 172 ; *Darley* v. *Darley*, 3 *ib.* 481 ; *Newhouse* v. *Goodwin*, 17 Barb. 236 ; *Lake* v. *Ranney*, 33 Barb. 49 ; *Pool* v. *Pool*, 33 Ala. 145, (20 U. S. Dig. p. 968, § 11.)

The contestants were therefore entitled to the very charge requested. But the charge, as given, entirely fails to meet either the request or the rule of law on the subject. The real scope and legal effect due to it is not given to the evidence.

Under such instructions a jury are left, and would naturally be led to set up a will against facts that have always been regarded as insurmountable.

*Daniel Roberts* and *George W. Harmon*, for the proponents.

I. The exception as to the admissibility of Colvin's deposition is objected to as " not relevant to the issue." It was relevant.

1. It was evidence of a purpose on the part of the deceased in 1858, and again in 1860, to make a will, and thus of a settled purpose

not to die intestate. 2. It was evidence of a purpose to distinguish against the heirs of his son Jeremiah, for a reason actual, or by him supposed to exist. 3. The correspondence between the provisions of the will produced and the paper drawn by Colvin, the difference being explained by the intervening death of his son Abel, and the birth of one of the Maranville children, was evidence of a settled purpose, such as the will produced consummated.

In these three respects, this deposition bore directly upon the questions of capacity and undue influence, involved in the issue.

4. It was made material by the testimony of Stukely T. Parker, a subscribing witness, which preceded the introduction of this deposition. Also by the testimony of William Broughton, a witness introduced by the contestants.

II. Exceptions as to testimony of Dr. Woodward, and his impeachment by Mrs. Thornton and Mr. Maranville.

1. A will may be proved against the testimony of one or all the subscribing witnesses. *Adams* v. *Field*, 21 Vt. 256 ; SUTHERLAND, J., in *Bowman* v. *Christman*, 4 Wend. 277, 283.

2. It follows that a subscribing witness may be impeached by the party calling him, by proof of contradictory statements. To oblige the proponent to produce all the subscribing witnesses, and yet to preclude him from impeaching such witness in this manner, would be specially unreasonable. The reason for the general rule does not apply in such case. *Brown* v. *Bellows.* 4 Pick. 179, 187, 188, 194 ; *Cowden* v. *Reynolds*, 12 Serg. & Rawle, 281 ; *Sigfried* v. *Levan*, 6 Serg. & Rawle, 308, 314 ; Olroyd's Case, 2 Russ. & Ry., Cr. Cas. 89, 1 Ph. Ev. 310 ; *Dennett* v. *Dow*, 17 Maine, 19, affirmed, in *Shorey* v. *Hussey*, 32 Maine, 579 ; *Williams* v. *Walker*, 2 Rich. Eq. 291, ( 8 U. S. Dig. 379, pl. 105 ;) Note to *Mynn* v. *Robinson*, 2 Hagg. 169 ; 1 Wm. Ex., 290 ; *In Re Lochlibo*, 1 Law & Eq. 646–7 ; 1 Greenl. Ev. § 443 ; *Coles* v. *Coles*, Law Rep. 1 P. & D., 70, (Am. Law Reg. for October, 1866, p. 180.)

Dr. Woodward on his direct-examination testified to formal execution only, the proponent resting upon presumption as to capacity. (*Dean* v. *Dean*, 27 Vt. 746.) It was upon his cross-examination that he testified to incapacity, and on this point he was the contestants'

witness. This differs, in our favor, from the case of *Dennett* v. *Dow*, *supra*, (see Fessenden's Brief, p. 21.)

Dr. Woodward, as an attesting witness, was competent to and did testify to his *opinion* of the testator's competency. Evidence of the expression of a contrary *opinion* was therefore admissible as an impeachment,—such *opinion* being a fact provable by declarations. *Daniels* v. *Conrad*, 4 Leigh. 401, 405 ; 1 Cow. & Hills' notes, 772. The court erred in obliging us to use the witness. It was enough that we produced him in court.

III. The question proposed to Maranville was properly excluded. It was immaterial.

IV. The question proposed to Willard upon his recall was improper in substance. It called for an expression of *opinion* as to a probability. It was out of time and place, and not a cross-examination upon the point testified to on the recall of the witness.

V. The third and fourth requests were based upon no evidence warranting them. All the evidence is found in Parker's deposition and Willard's testimony. From this it appears that the testator first named his wife, and a provision for her, without prompting or suggestion.

As to Stukely T. Maynard, when the inquiry is made, whether he has forgotten him, the testator answered, " No," etc. The inquiry could only be a speculation and a guess, whether the testator would have remembered, or would have provided for them, without suggestion—a fact not susceptible of proof. From that fact alone, if proved, the jury would not be authorized to infer a want of testamentary capacity ; for such finding would involve a disregard of all the facts proved. *Buger* v. *Hill*, 1 Bradf. 360.

VI. The fifth and sixth request seek to get an expression of the judge's opinion to the jury upon the weight of evidence—"affords *strong* ground for the inference," etc.,—"was entitled to much consideration, etc., and raised a *strong* presumption, etc." The weight of this evidence was properly left to the jury, and the requests were fairly answered.

VII. The ninth request is substantially answered in the answers to the seventh, eighth and tenth requests, and the answer to this

request.  The jury are there instructed to take into consideration " all the circumstances attending the entire transaction," etc.  This includes the presence of some, and the absence of others of the natural objects of the testator's bounty.  But the mere presence of some, and the mere absence of others, is not a circumstance from which the jury would be authorized to infer an undue influence exercised, or any influence exercised.  The exercise of undue influence is a wrong and not to be presumed.  It is equivalent to fraud.

In the case of an "officious" will, that is, when the estate is distributed among the natural objects of a testator's bounty, as his relations, although unequally, the presumption is in favor of the will without proof of instructions; and this, even in cases of doubtful capacity.  *Brogden* v. *Brown*, 2 Adams, 441 ; *Barry* v. *Butlin*, 1 Curteis, 637 ; *Smith* v. *Dalby*, 4 Harrington's R. 350.

To presume fraud or imposition on the part of these more favored beneficiaries, from their near presence, or their more intimate relations with the testator, without evidence that such relations " were used as a means of coercion, restraint or imposition, would be monstrous."   *Bleecker* v. *Lynch*. 1 Bradf. 471–2 ;   *Remson* v. *Brinkerhoff*, 26 Wend. 340 ;  Park, B., in *Barry* v. *Butlin*, 1 Curteis, 637.

VIII.  The eleventh request could not be answered, for it was not "good law to the full extent."  The reasons assigned are no part of the request.  These are only arguments.

The two previous drafts of a will were evidence of a " previous intention" not to die intestate, and so must be " taken into consideration."  2. The second draft differed from the first, in that less was left by it to the heirs of Jeremiah than by the first.  The reason for this is found in the fact of the dissatisfaction of the testator with the conduct of Jeremiah's administrator in the settlement.  3. The provisions of the second draft corresponded with the provisions of the will, except so far as the death of Abel and the birth of one of the two Maranville children required a change.  4. The fact that he retained the draft in his possession, although unexecuted, was not evidence that he never intended to execute it, but rather that he was

waiting to see whether new circumstances might not arise, requiring a change in its provisions before execution. 5. The request assumes that the testator's apprehension that Jeremiah's heirs might not do right was never realized. Again, the testator's understanding and belief as to the fact, rather than the fact itself, must be allowed to control his purpose.

THE opinion of the court was delivered by

STEELE, J. I. 1. In the county court, upon appeal from the probate court, on trial of the issue whether the probate should pass, the proponent of the will examined two of the attesting witnesses and produced the third, Dr. Woodward, but declined to examine him. The court ruled that the third must also be examined by the proponent. The third was accordingly under this order of the court examined, but only in respect to the formal execution of the will. Then, on cross-examination, the witness stated in substance, that the decedent was not, in his judgment, of testamentary capacity when he executed the will in question. After the usual preliminary inquiries, the proponent was permitted in the progress of the trial, for the avowed purpose of impeaching the credit of the witness Woodward, to prove, by the deposition of Mr. Parker and by other persons, that the witness had out of court expressed a different opinion, to the effect that the decedent was of sound mind at the time, and that his faculties seemed to have been just spared to make this will. To the admission of this impeaching testimony the contestants excepted, upon the ground that the proponent should not be allowed to attack the credit of his own witness.

The first question for decision is, whether it is necessary for the proponent, in order to establish a will, to produce and examine all the attesting witnesses, when in his power so to do. If this is not necessary, Dr. Woodward might be treated as not the witness of the proponent. The case would resemble *Rex* v. *Oldroyd*, Russ. & Ry. Cr. Cases 88, in which the judge of his own motion called as a witness the prisoner's mother, whose name was indorsed on the indictment as one of the witnesses for the prosecution, but who had not been called by the prosecuting counsel. Her testimony

proved favorable to the prisoner ; and the court then permitted her to be impeached, by reference to her former deposition. In this, although the trial was upon an indictment for murder, all the judges, including Lord MANSFIELD and Lord ELLENBOROUGH, held there was no error.

Our statute requires wills to be attested by three witnesses, but is silent as to the manner in which they shall be proved when contested. When not contested the statute provides, that they may in the discretion of the judge be admitted to probate upon the testimony of one of the subscribing witnesses : G. S. p. 379, § 18. This provision would indicate that more were to be required in other cases. In an English common law court, when, as in an action of ejectment, the issue was made upon the validity of a will, the devisee was obliged to call but one of the attesting witnesses, if that one testified to a sufficient execution : 1 Phil. Ev. (Cowen & Hill's Ed.) 496, 501 ; *Anstay* v. *Dowsing,* 2 Str. 1254 ; *Jackson ex dem. Le Grange* v. *Le Grange,* 19 Johns. 386. In the Ecclesiastical Courts, it was necessary that all should be produced by the devisee, if in his power ; but he was not required to examine all himself : *The Lochlibo,* 1 Eng. Law & Eq. 645–7.

It is urged that one or the other of these rules should prevail here. But, it is to be remembered, that at common law a will is proved merely for the purpose of the case on trial, and may be again put in issue ; and in the Ecclesiastical Courts it was proved with reference to the distribution of none but personal estate : 2 Bouvier's Bac. Ab. 730. The only method by which until recently a will, when it related to real as well as personal estate, could be *established* in England, was by a bill in chancery ; and in such cases, says Lord CAMDEN (*Hindson* v. *Kersey,* 4 Burn. Ecc. Law, 91,) it was the "invariable practice" to require the three witnesses to be examined. It would seem, however, that upon an issue in chancery, other than for the purpose of *establishing* the will, the examination of the three witnesses was not required. So, in the case *Tatham* v. *Wright,* 2 Russ. & Mylne, 1, reported also in 6 Eng. Ch. Rep. 366, where the will was attacked by the heir-at-law, who brought his bill praying that the will be declared void, and the devisee be restrained from setting up

a legal estate as a bar to an ejectment, and issues upon the validity of the will were made up and sent out for trial by jury before PARKE, J., one only of the subscribing witnesses was examined by the devisee, the others being produced in court and offered to the other party. The verdict being in favor of the will, the heir-at-law filed a motion for a new trial, which was refused by Sir JOHN LEACH, Master of the Rolls. The heir then moved the Lord Chancellor for a new trial, and in the meantime his counsel, Mr. Brougham, who had acted for him before the jury and had argued in behalf of the motion before the Master of the Rolls, had himself become Lord Chancellor. Under these circumstances Lord BROUGHAM asked Lord Chief Justice TINDAL and Lord LYNDHURST to sit with him, and all three agreed that the motion was not well founded and must be refused; Lord BROUGHAM remarking, " there is a broad line of distinction between cases where the moving party seeks to set the will aside, and cases where the moving party is a devisee seeking to establish it; the rule which makes it imperative to call all the witnesses to a will, must be considered as applicable to the latter only." The application of this rule to proceedings in which wills are " established " is also recognized in the opinion of the Lord Chief Justice in behalf of himself and the Lord Chief Baron. The same doctrine was distinctly held by Lord ELDON : *Bottle .v. Blundell*, 19 Ves. Jr. 501–508. See also *Chase* v. *Lincoln*, 3 Mass. 236 ; 1 Phil. Ev. (Cowen & Hill's Ed.) 496–7 ; *Ogle* v. *Cook*, 1 Ves. Sen. 177 ; 10 Bouvier's Bac. Abr. 518–19, and cases cited. There are some *dicta* to the effect that this rule was not invariable, but we are aware of no English case in chancery, in which a will was *established* without the production and examination of all the subscribing witnesses, if all were within reach of process and obtainable——unless it may be in case of waiver by the heir-at-law.

It is held that the production of attesting witnesses is excused by proof of their death (*Nickerson* v. *Buck*, 12 Cush. 332,) insanity (*Bennett* v. *Taylor*, 9 Ves. Jr. 381,) absence from the country (*Lord Carrington* v. *Payne*, 5 Ves. Jr. 404,) or incompetency arising subsequent to their attestation (2 Redf. Wills 34 ; G. S. p. 378–9, §§ 10, 19. See also *Wyndham* v. *Chetwynd*, 1 Black. Rep. 95.) The rule

which requires them all to be examined, if practicable, is founded upon reasons of policy and caution, and has no reference to the measure of proof necessary to establish a will, which is a measure no greater than is usually required to establish a fact : *Dean* v. *Dean,* 27 Vt. 750. The proponent of a contested will is entitled to prevail, if there is a fair balance of testimony in favor of the validity of the will. We think, if our statute requires any aid for its interpretation from the English practice, in determining how. many subscribing witnesses should be called to prove a will, we should look to that English court in which alone wills were, as in our probate court, established ; and to the rule of that court in establishing wills, instead of regarding the rule at law or in the Ecclesiastical Courts, or even in the recent English court of probate. So far as we are informed, the production and examination of all the witnesses have been always required and thought necessary in this state. See opinion of ISHAM, J., in *Dean* v. *Dean,* 27 Vt. 749. We are of opinion that the court was correct in ruling that the proponent must examine all the attesting witnesses.

2. This being settled, the next question is,—Was the testimony on behalf of the proponent to impeach one of these witnesses, by his previous declarations, admissible? It is useless to attempt to justify the admission of this testimony under any *general* rule. The due execution of a will involves the question of sanity as well as of signature, but even if this was not so, and the cross-examination instead of being legitimate had been so much upon a new subject as to deprive the contestant of the right, except by leave of court, to ask leading questions, still, under the general rule, the witness remains the witness of the party who produced him, so far that he may not be impeached by that party : *Fenton* v. *Hughes,* 7 Ves. 287 ; *Ellicott* v. *Pearl,* 12 Curtis 187–8 (from 10 Pet. 440–1.) Nor can the testimony relating to the previous declarations of the witness be regarded as proof of a substantive fact ( *Gould* v. *Norfolk Lead Co.,* 9 Cush. 338,) so as to come within the rule which permits a witness to be contradicted, and thus *incidentally* impeached by proving the facts in issue to be different from his statement of them : *Friedlander* v. *London Insurance Co.,* 24 E. C. L. 47, 4 B. & Ad. 193 ; *Ewer* v.

*Ambrose*, 10 E. C. L. 220 and note, 3 B. & C. 746 ; *Sigfried* v. *Levan*, 6 S. & R. 308 ; *The Lochlibo*, 1 Eng. L. & Eq. Rep. 645–8– 9–651, a rule which is so well recognized that while a will may not be established *without* the evidence of the attesting witnesses, it may be established *against* the combined testimony of them all by proof from others : *Lowe* v. *Jolliffe*, 1 Black's Rep. 365 ; *Adams* v. *Field*, 21 Vt. 256 ; *Jauncey* v. *Thorne*, 2 Barb. Ch. 40 ; *Bowman* v. *Christman*, 4 Wend. 277 ; 10 Bouvier's Bac. Abr. 527, and cases cited.

The declarations of Dr. Woodward out of court cannot be shown to prove his opinion. Such statements could only have weight in impeaching the credit of Woodward, and not in establishing what his opinion was of how the fact was. That the proponent examined the witness only so far as the law made it his imperative duty *to* examine him ; that he then sought to impeach him, not by attacking his general reputation, but only in respect to this testimony by his own declarations inconsistent therewith ; that these declarations were made after he was selected as an attesting witness by the decedent ; that whatever the usual presumption of law is, his credibility was, in fact, not indorsed by the party who called him under compulsion, are rather reasons to be urged why this testimony should be received against the general rule, than arguments *to* prove that such testimony is receivable under it. On the other hand, there is no force in the objection to the admission of this testimony so far as it is put upon the ground, that it is an impeachment of the *legal proof*, without which the will may not be established ; for the will may, as has already been remarked, be established against it by other proof. The rule which provides that the will shall not be probated without this testimony, does not provide that it shall not be probated without this testimony *in its favor*. Being participants in the execution, if the will was duly signed, and thus having special opportunity and occasion to observe and know what the trier must ascertain to determine upon the validity of the will, the law as well as sound policy requires them to be called and heard. It does not require them to be believed. Their claim to belief depends not only upon their opportunities of knowledge upon the subject, but also upon their care, skill,

judgment, memory, and *truth*.   While it is settled that their testimony may be overcome or outweighed by testimony from others, produced on behalf of the same party, the question now is whether the *force* of their testimony to be thus overcome, may be lessened by an impeachment of their credit, as was done in this case, or whether, on the contrary, the proof from others must be sufficient to establish the fact and outweigh or overcome theirs, not lessened in force by any such impeachment.

We are not aware that the rule, that a party is estopped from impeaching the credit of his own witness, has ever been recognised as inflexible.   It is not so treated by the text writers.   Mr. Phillips says, it will not *in general* be allowed, but in remarking upon impeachment by previous declarations, refers to the opinion expressed by Lord MANSFIELD and Lord ELLENBOROUGH in *Oldroyd's case*, before referred to, to the effect that the prosecutor would have had the same right with the court, to impeach the credit of the witness by her former deposition under the circumstances of that case.   Mr. Starkie also refers to the question as unsettled, and thinks that upon reason and principle it should, in some cases, be allowed to the extent of proving the representations of the witness upon the subject in relation to which he testified.   Mr. Greenleaf refers to the question as one upon which there is a diversity of opinion, but says that the weight of authority seems to be in favor of allowing witnesses to be impeached by former declarations, in some cases.   In the course of his discussion of the subject, he refers particularly to cases in which the witness is one " whom the law obliges the party to call, such as the subscribing witness, to a deed or will or the like ;" and seems to think their general credit may be impeached by the party calling them :  1 Phil. Ev. (Cowen & Hill's Ed.) 309–11 ;  1 Starkie's Ev. 217–20 ;  1 Greenl. Ev., § 443.   See also discussion of cases relating to right of party to contradict, and sometimes even to discredit, his witness, in 2 Ph. & Amos Ev. (5th Am. Ed.) 838–43 [*902 *et seq.*]

Nor are the books destitute of express judicial decisions to the same effect.   The refusal to admit precisely such testimony as this on the part of the proponent, to impeach the subscribing witness of a

will, was disapproved by the supreme court of Pennslyvania in *Cowden* v. *Reynolds*, 12 S. & R. 280, and a new trial granted that it might be received. So, too, in *Dennett* v. *Dow*, 17 Maine, 19, a new trial was granted upon the sole ground that the court below rejected such testimony in a trial upon the issues of the sanity of the testator, and the due execution of the will. This case was affirmed by *Shorey* v. *Hussey*, 32 Maine, 579. In South Carolina, the admission of evidence to impeach the general credit of the subscribing witness to a deed, on the part of the party who called him, was approved : *Williams* v. *Walker*, 2 Rich. Eq. Rep. 201.

In *Bootle* v. *Blundell*, 19 Vesey, Jr., 500, 502–509, all the attesting witnesses gave their depositions in the court of chancery, but upon trial of the issues sent by the court to the jury one only of the subscribing witnesses was examined, the plaintiff declining to examine the other two. The plaintiff introduced other proof, strongly in his favor, and the defendant then gave up the cause. Afterwards the defendant moved for a new trial because all the attesting witnesses were not examined. The Lord Chancellor (ELDON) holding that the heir at law might waive the rule of court for his benefit that all the attesting witnesses must be examined, and from an examination of the whole record, being satisfied that their testimony would not alter the result, and guarding the case as a precedent, denied the motion ; but expressed great dissatisfaction with the irregularity of the trial, and remarked that the subscribing witnesses " are the witnesses of this court and not of either party, as erroneously considered." " If," he says, " the object is to establish a will, this court does not give the devisee the opportunity of carrying it before a jury until all the three witnesses have been examined, and will have them all examined, considering them as its witnesses without entering into the dispute frequently occurring in a court of law, whether the person called is the witness of the one party or the other." " This court, therefore, before an heir shall be deprived of that opportunity which the law gives him by repeated ejectments to question again and again the validity of the will, until his conduct constitutes a case of that vexatious nature which induces the court to grant an injunction, the court, as it will know the whole truth, expects that all the

witnesses shall be examined on the one side or the other. If I had tried such an issue I should have told the jury that these witnesses, if not to be considered the witnesses of the plaintiff, were not, though they had been called by the defendant, his witnesses, but that this was a proceeding to try the actual fact with a view to the information of this court; who must, to establish the will, know the whole and therefore the case must go to trial without that prejudice which is the consequence of considering them as the witnesses of either party, and merely as a judicial proceeding to inform the court." See also *Coles* v. *Coles*, Law Rep. 1 P. & D. 70.

In all these cases the witnesses were what may be called *instrumental* witnesses. Many cases may be cited the other way (as see *Brown* v. *Bellows*, 4 Pick. 179 ; *Queen* v. *State*, 5 Harr. & John. 232 ; *Lawrence* v. *Barker*, 5 Wend. 301 ; *Whitaker* v. *Salisbury*, 15 Pick. 534 ;) and in such a conflict of authority, this being the first occasion on which the question has, so far as we are informed, arisen here, we have felt considerable hesitation about admitting an exception to a wholesome general rule. But where the reason of a rule ceases the rule generally should also, unless some special inconvenience or mischief will be likely to arise from the practical application of the exception. The reason of the general rule is that a party should be estopped from impeaching the credit of the witness whose credibility he indorses by calling him. The reason fails when in fact the party is, as in this case, compelled by law to call him, no matter how much he doubts the credibility of the witness, before he can be allowed to prove his case by others on whom he relies. There certainly would seem to be no ground in reason or convenience in holding the party estopped from impeaching such a witness to the extent of proving his former declarations on the same subject. The fairness of holding a party estopped by reason of an act with relation to which he has no choice or by an indorsement which he does not make of a witness whom the law calls and makes current whether the party indorses him or not, may well be questioned. It would seem enough that the party is obliged to examine him and make his way through him by such an impeachment and to prove the facts by others—that he is required to furnish the court with the testimony

of the attesting witnesses on account of the presumption of their knowledge of the matter, with the permission to endeavor to overcome their testimony if adverse—without tying his hands in the effort to overcome it, by depriving him of the ordinary, natural, and most effective means to aid him in so doing. The case is quite different from the one supposed, in which the only person who knows a material fact, as in an assault, is called from the necessity of the *case* and testifies against the party who called him. If no one else knows the fact the party cannot be benefitted by impeaching the witness, because that will not prove the fact; and if any one else does know it and is reliable, he should have seen to it that he called the reliable witness. He is at liberty to choose. But if by some rule of law he was first compelled to call one of the witnesses in preference to the other, the cases would be similar. It is strongly urged that though the witness may not have been indorsed by the proponent, he was indorsed by the decedent. If we assume that he signed at the request of the decedent, which in some cases might be the point in question, and that the devisee who claims through the will to represent the decedent is more responsible for the decedent's selection than the contestant who claims by heirship to represent him, still the case stands very differently from the case of any other than an *instrumental* witness. That individual of the bystanders who was asked to write his name as a witness must be called. In ordinary cases of requesting a bystander to remember and bear witness, the party would not be required to call the person whose attention was invited, if he preferred to call others instead. The witnesses to an instrument, even if carefully selected at the time they attest, may change in character, feeling, and interest before being called to testify. To forbid the proponent the impeachment of a witness to the will by his own declarations made after his selection as an attesting witness, while, if he becomes *entirely incompetent*, the will may be proved without his testimony, would, we fear, be carrying the general rule to an extent which would be inconsistent and could only be justified by artificial and arbitrary reasons, and which would not be calculated to aid the truth, the ultimate end of laws of evidence. We are aware that many but not all the reasons for admitting this testi-

Thornton's Executors *v.* Thornton's Heirs.

mony would apply as well to an impeachment of a general nature. But the authorities have in many instances made a clear distinction between the admission of an impeachment of the general veracity of the witness and an impeachment by proving declarations of the witness inconsistent with his testimony.   Whether the distinction is well taken we desire to express no opinion.   We think this testimony, to the extent and under the circumstances of its admission in this case, was properly received.

3.   Another question grows out of the testimony of this attesting witness, Dr. Woodward.   The contestants excepted to the refusal of the court to instruct the jury in accordance with their sixth request " that the testimony of Dr. Jonathan D. Woodward, as being one of the subscribing witnesses to the instrument in question and the attending physician of the alleged testator, was entitled to much consideration on the question of capacity, and raised a strong presumption against the validity of the will." The weight of his testimony, so far as it depended on his being a medical attendant of the decedent, must be conceded to have been a matter of fact with relation to which the comments of the court are not a subject of exception. But it is claimed that the weight of his testimony, so far as it depended on his being a subscribing witness, was a *matter of law* and that the court was bound to rule as requested, even though the witness was contradicted by both the other subscribing witnesses and by his own previous declarations, and even though by his own statement he made no suggestion to any one, at the time of the execution of the will, that he doubted the testator's capacity, and was not sure that he had any conversation with the testator on the day in question. The court in response to this request told the jury that they should consider his professional skill and experience, but that the weight and value of his testimony must also be determined, like that of the other witnesses on this subject, " with reference to his opportunity for observation, his skill and care in observing, his intelligence and powers of discernment and memory," which doubtless would ordinarily be a correct rule for measuring the value of the testimony of a truthful witness.   Is there a weight given *by law* to the testimony of a subscribing witness apart from or beyond what it would be entitled

to under these considerations which usually govern the value of testimony? We think the prominence which, in opinions where both law and fact are discussed, is given by courts to the testimony of a subscribing witness to a will, arises from his acknowledged opportunity of observation at the precise time in question, and from the probability of his using the opportunity on account of his participation in the transaction. · If it clearly appears from his own testimony that he did not use the opportunity, this special value of his opinion ceases. It is because of this opportunity, and not because he wrote his name on the instrument, that the testimony of an attesting witness is usually listened to with attention, and it was with reference to this opportunity that the jury were instructed to weigh the testimony of Dr. Woodward. It was not entitled to more weight than testimony from other witnesses of equal credit, better opportunity, and more judgment and knowledge upon the subject. It should not be invested by law with any fictitious official weight, so as to pass for more than it is worth; and its real value, if truthful, is measurable by the rules laid down by the court. This question is to some extent involved in the one already passed upon. If evidence to impeach the credit of Dr. Woodward was properly received, it would hardly be consistent to hold as a matter of law that his testimony deserved especial consideration and carried a strong presumption with it, whether his credit was successfully impeached or not.* We find no error in the refusal of the request or in the instructions of the court upon the subject.

II. The contestants in their eleventh request asked the court to rule that for the reasons named in their request, " the evidence in regard to the two previous wills drawn up but not executed · by the alleged testator, afforded no proof of any intention on his part that could be taken into consideration on the question of capacity or influence." It is well settled that evidence of previous wills, executed or unexecuted, drawn under the instructions of the testator, is admissible. So, too, evidence is received, as was done here, to prove the condition of the testator's estate, his family relations, affections, and

---

* As to value of testimony of attesting witnesses, see note (1,) *Burrows* v. *Lock*, 10 Vesey, (Sumner's Edition,) p. 476.

declarations of testamentary intention, accompanied by no act.   Such evidence informs the triers of the preferences of the testator; and the operations of his mind upon the subject, when he was confessedly in sound health, and thus aids them in determining whether the instrument in question was the work of the same will.   The counsel for the contestents concede in argument the *admissibility* of this testimony, but deny that it is entitled to any force.   To be admissible, it must be relevant to one of the two questions tried, capacity and influence ; and if the court had told the jury, as requested, that it was not to be considered on either of these questions, he would have ruled the evidence out of the case.   The reasons of the request are, in substance, that the other testimony in the case destroyed the force of this.   The jury would be the judges upon that question if the other testimony was conflicting, or if it was of a character not to necessarily deprive this testimony of all weight.   The first ground upon which this request is based, is, that the testimony of Colvin shows the two unexecuted wills to be unlike.   If they were substantially unlike, it might lessen but not destroy their title to consideration.   The testimony of Colvin does, however, tend to show that they were substantially alike.   The draft of 1858, as he says, was left unexecuted by the decedent on account of a difficulty between the testator and the heirs of his deceased son Jeremiah, which it appears involved not over six hundred dollars, and the draft of 1860 was made in order, as the testator said, to make this right.   The witness remembers no other material changes.   The heirs of Jeremiah were still made legatees in the draft of 1860, and were provided for more generously than other grandchildren of the testator.   The second ground of this request is, that the draft of 1860 was made with relation to this difficulty, which the contestants' evidence tended to show ceased before the will in question was executed in 1865.   The testimony on the subject of the continuance of the difficulty was conflicting, and the court could not in any event have based upon it the charge requested, without deciding the fact.   But assuming that the jury found that the difficulty was healed, the case is not changed ; for the will of 1865 did make a different bequest to these heirs from the one provided in the draft of 1860, while most

of the legacies remained substantially the same. They were precisely the same to the heirs of his other deceased son Stukely. No change was made in the legatees, with the exception of the addition of Mary E. Maranville, who was not born when the draft was made, and is made to divide the bequest which was there provided for her sister, and the substitution of the widow of Abel Thornton, as residuary legatee, in the place of Abel Thornton himself, he having died since 1860, and before the execution of the will in question. The other reason, which is made the ground of this request, is the fact that the testator kept the draft of 1860 until 1865 without executing it. This was a proper subject of comment on both sides, but that an intention is not executed is not conclusive proof that no intention existed. Upon the undisputed facts of the case we think the court was justified in telling the jury that the instructions to Colvin, with relation to drawing the unexecuted will of 1860, should in any event be regarded as affording " very considerable light " upon the question of the testator's intentions. So far as the will in question varied from the draft, or so far as that part of the instructions which related to the heirs of Jeremiah affected the case, the contestants had the advantage of it under this charge. We therefore think there was no error in this portion of the charge, either considered with reference to the refusal of the request, or considered affirmatively with reference to the instructions the court did give the jury.

III.  1.  The court refused to permit the party to be inquired of whether it was not his apprehension that Wood would testify in a particular manner which induced him to discharge Wood from further attendance, on his behalf, as a witness. It is not claimed that the witness was concealed. He was merely discharged, and afterwards summoned and examined by the other party. We think no error can be based upon this ruling.

2.  Nor do we think that the refusal of the court to permit Willard, after he returned and corrected a point in his testimony, to be re-cross-examined except strictly upon the point corrected, can be treated as a ruling upon a question of law. In the opinion of the majority of the court, it was entirely in the discretion of the judge

whether the cross-examination should be thus limited or not ; and in the opinion of other members of the court the question was improper, because it called the attention of the witness to no single point in his testimony in the probate court, but to the whole collectively, and assumed that there was a contradiction between the testimony of the witness then and in the county court.

3. The question allowed to be put on cross-examination to Dr. Allen is objectionable, because it assumes a state of facts upon which no medical or expert opinion could be based. Dr. Allen seems to have so understood it, and declined to give any such professional opinion, but replied in substance : "I must *understand* from your question that the man was able to make a will." The whole matter stands as if the question was unanswered, and the propriety of the question, as the correlative of the one asked on the examination iu chief, need not be considered.

IV. 1. The contestants except to the refusal of the court to tell the jury, in accordance with the third and fourth requests, that if his wife and the great-grandchildren, Stukely, Maynard, and Flora J. and Mary E. Maranville, who are all legatees, would have been omitted in the will by the testator, without motive, but for the promptings and suggestions of others, they would be authorized to infer testamentary incapacity. The main evidence upon which this request is founded is the testimony to the effect that some one said to the testator, when he was giving his instructions for the drawing of his will, " you must not forget Stukely and the little ones," and he said he had not, and remembered them with the same amount of property he had set apart for them in the unexecuted draft ; and the testimony of another witness that his wife who was present said to him that he must not forget Stukely, and he replied, "I must not forget my wife." It is not clear that any one used this language with reference to any supposed lack of memory. It seems rather to have been used as an-expression, on the part of the heirs who were present, of their desire that these little ones should be remembered with a bequest. We think the evidence that they would have been forgotten is exceedingly slight and inferential. There is other evidence of conversation between the testator and the scrivener, and

with the wife as to her legacy, but it adds very little, if anything, to that mentioned. That a legacy is made which would not have been thought of but for the suggestion of another does not necessarily prove incapacity. It might occur with the strongest mind in the vigor of youth and health. The fact that such suggestions were made is proper evidence to consider with other circumstances upon the question of capacity. The court did tell the jury, in response to the second request, that the testator must have been capable, without prompting, of collecting and retaining in his mind long enough to form a rational judgment upon them, the amount and condition of his estate, the names and number of those having claims upon him, their relative merits and necessities, and what he had before done for each ; in short, that " he must have been capable of recollecting the full state of all his affairs, and of weighing the just merits and demerits of those who belonged to him, by remembering all and forgetting none ;" subsequently properly explaining and qualifying this expression so as not to fix a standard of capacity equal to the transactions of an extensive or complicated business. We do not think that the contestants were entitled, in addition to this, to an application of this rule to a supposed omission of particular individuals which the jury might find, would have been made but for the prompting of others. To say to the jury that, from this scrap of evidence, they might infer that some one would have been forgotten, and that from this inference they might infer testamentary incapacity, and to make this the subject of a distinct separate submission to the jury, would have been giving this evidence a very undue prominence. It would have been more becoming in the argument than in the charge of the court to the jury. We think that it was enough that this evidence was given the jury, with other surrounding circumstances, to be weighed on the main question.

2. For somewhat similar reasons, we think the court was right in refusing the ninth request, in which the contestants had collated certain conceded and certain disputed facts, and, isolating them from others which would affect their force, asked the court to say to the jury, that they might infer undue influence from them if found. The court properly explained to the jury what would amount to undue

influence, and called the attention of the jury to the different classes of testimony tending to show it, and left it for them to say how the fact was. It was not the duty of the court to isolate a part of the case from the other facts which affected it, and make this unreal case the subject of one separate branch of his charge. All the matters named in the ninth request, namely, the age of the testator, his infirmity, the nature of his malady, the fairness of the will, the effects of undue importunity, the circumstances under which the will was made, were called to the attention of the jury, and they were left to decide the question of undue influence in view of all the facts together. The court was not bound to tell the jury just how much evidence would be sufficient to sustain a verdict upon the ground of undue influence. Had no other facts appeared in the case qualifying those named in the ninth request, it might have been error for the court to refuse to charge as therein requested. The other exceptions saved on the trial were abandoned in this court.

The result is, the judgment of the county court is affirmed, and ordered to be certified to the probate court.